Filed 12/16/21  P. v. Talkington CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>DAVID RICHARD TALKINGTON,<br><br>    Defendant and Appellant. | D077674<br><br><br>(Super. Ct. No. SCD280382) |

APPEAL from a judgment of the Superior Court of San Diego County, Frederic L. Link, Judge.  Affirmed in part; remanded for resentencing.

Denise M. Rudasill, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Rob Bonta, Attorneys General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Michael Pulos and Juliet W. Park, Deputy Attorneys General, for Plaintiff and Respondent.

In response to a 911 call about an apparent domestic dispute, police found defendant David Richard Talkington inside male victim Stacy C.'s bloody, 216-square-foot single-room-occupancy (SRO) apartment unit. Talkington had no visible injuries, but Stacy was bleeding profusely from his face, had a stab wound to his calf, and was in immense pain from two broken vertebrae. Both men initially told police Stacy had suffered a seizure, but Stacy later told hospital staff he had been jumped by strangers, before finally telling police Talkington had burst into his apartment and beaten and stabbed him. Stacy explained he initially lied because Talkington told him to do so or he would cut Stacy's head off.

Talkington was charged with attempted murder (Pen. Code,[1] §§ 664, 187, subd. (a)), assault with a deadly weapon (§ 245, subd. (a)(1)), burglary of an inhabited dwelling (§§ 459, 460, subd. (a), 667.5, subd. (c)(21)), making a criminal threat (§ 422), and attempting to dissuade a witness from reporting a crime (§ 136.1, subd. (b)(1)). Most of the charges carried great bodily injury (§ 12022.7, subd. (a)) and deadly weapon (§ 12022, subd. (b)(1)) enhancement allegations. The jury found Talkington guilty of the assault, criminal threat, and dissuasion counts, and found the attendant enhancement allegations true. The jury acquitted him on the remaining counts. The trial court denied probation, and sentenced Talkington to six years in prison.

Talkington asserts three categories of error on appeal. First, he contends the trial court erred prejudicially by allowing witnesses to testify about hearsay statements Stacy (who ultimately testified at trial) made to them about what had happened. Second, he contends the prosecutor erred during closing argument by commenting indirectly on the fact Talkington did

---

[1] Undesignated statutory references are to the Penal Code, except in Discussion part I, where they are to the Evidence Code.

2

not testify at trial, and by improperly shifting the burden of proof to the defense. Finally, Talkington contends the court erred at sentencing by failing to consider his potential military service-related traumatic brain injury (TBI) and post-traumatic stress disorder (PTSD) in deciding whether to grant probation and whether to impose a lower term sentence. (§§ 1170.9, 1170.91; see *People v. Panozo* (2021) 59 Cal.App.5th 825, 831 (*Panozo*).)

As we will explain, we find no prejudicial evidentiary error and no prosecutorial error. However, because the record is ambiguous as to whether the trial court considered Talkington's potential TBI or PTSD in making its discretionary sentencing choices, we will remand for resentencing. In all other respects, we affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

### *Prosecution Case*

Stacy and Talkington met eight or nine months before the incident, when Stacy was staying at Father Joe's Village for a few nights and saw Talkington there. Stacy characterized their relationship as "acquaintance[s]."

About four months before the incident, Stacy moved into a 216-square-foot unit in an SRO apartment complex. At some point, Talkington moved into the same complex. Stacy testified he gave Talkington a TV and other personal property in exchange for Talkington helping Stacy move some other belongings into his apartment. After that, Talkington went to Stacy's unit only "about three times" to borrow change, a cigarette, or a drink.

Stacy's "pretty good friend[ ]" and neighbor, April, testified she never saw Stacy and Talkington "hanging out together," and she did not believe they were friends. April was not friends with Talkington, and would only

3

"see him in passing." She once overheard Talkington tell another neighbor he had been a Navy SEAL.

About three days before the incident, Stacy—an admitted alcoholic—sought medical assistance to attempt once again to get sober. He was prescribed Librium (a controlled substance used to mitigate seizures and withdrawal symptoms) on the condition that he have friends bring him the medication and soup three times per day. April and another friend and neighbor, Chantal, agreed to help Stacy.

April and Chantal described Stacy's condition as he was detoxing as "very weak," "very sick," and "shaky." Despite his medication, he was having seizures and trouble moving about. The day before the incident, he was able to walk, but the day of it, "all of a sudden he couldn't."

On the day of the incident, April checked on Stacy around 9:45 or 10:00 a.m. "He looked very sick" and "very pale"; "had been throwing up all over the bed"; "was wrapped up very tight like a cocoon in a blanket"; and needed April's help getting to the bathroom. April asked Stacy for his apartment key so she or Chantal could check on him later, but Stacy did not know where his key was so he told her he would leave the door unlocked.

Around 2:45 p.m., Stacy's neighbor Robert was walking down the apartment hallway when he "heard an argument" with "raised voices" inside Stacy's apartment. Robert thought one voice was male and the other female. He heard the male voice say in a serious and "[v]ery aggravated" tone, "I will kill you." Robert "stopped for a second sort of in disbelief of what [he] heard," and "then a few seconds later" heard the male voice say in a serious tone, " 'I'm an ex Navy SEAL; I can and will kill you.' " The other voice in the room "sounded kind of muffled and quiet," so Robert "couldn't discern anything that was being said." Robert "was afraid someone was serious about killing

4

someone else," so he reported the incident to the apartment manager and called 911. A recording of his 911 call was played at trial.

In response to Robert's call, San Diego Police Officers Garrett Kain and Paul Yi were dispatched to Stacy's apartment. Officer Kain activated his body-worn camera when he arrived at the complex, and portions of the footage were played at trial.

Officer Kain knocked on Stacy's door and identified himself as a police officer. Talkington responded from inside, "Yeah, he uh . . . sorry, he had a seizure . . . Yeah, he had a seizure . . . ." Talkington unlatched the deadbolt and opened the door, repeated that Stacy had had a seizure, and requested that the officers call an ambulance. Officer Kain saw that Stacy had blood on his face and body, lacerations on his face, a laceration or puncture wound on his calf, and a swollen eye. Stacy appeared to be in an "incredible" amount of pain. Talkington did not appear to have any injuries, but had blood on him. Stacy and Talkington both told Officer Kain that Stacy had had a seizure.

Officer Kain directed the men to step into the hallway while he quickly searched the apartment to make sure no one else was inside. The officer did not find anyone or any weapons inside, but he saw blood on various areas of the floor, including a large pool next to Stacy's bed and on his mattress. Based on the "alarming" amount of blood, Officer Kain became "concerned that this might not be just a seizure" and that he "wasn't being told the truth as to what happened." He "could tell something was wrong"—Stacy "look[ed] scared" and Talkington "seemed nervous."

Paramedics and more police officers responded to the scene. Officer Kain did not question Stacy further at the scene because he did not want to interfere with the paramedics. But the officer followed Stacy to the hospital "to see if [he] would tell . . . a different story if he was away from Mr.

5

Talkington." Stacy "seemed less scared at the hospital," but "he was in incredible pain" that prevented him from answering some questions. Stacy did not tell Officer Kain or hospital personnel that he had been involved in a fight. When Officer Kain asked Stacy "specifically" if Talkington "did this to him," Stacy responded, " 'You know I can't tell you that.' " When asked to explain why he could not discuss it, Stacy said, " 'I can't talk to you about what happened. They will kill me.' " He "refused to elaborate on who did this to him."

Stacy received several stitches over his left eye and in his right calf, and he was diagnosed with two broken vertebrae. He also had cuts on his forehead and nose, and his left eye was swollen and bruised.

The day after the incident, Stacy began staying at his friend April's apartment so she could tend to him. He appeared to be in "[v]ery much" pain, and was "[v]ery, very scared." April testified Stacy "was shaking, terrified, [and] having nightmares when he did sleep. He was screaming that he's going to come back and get me."

At some point the day after the incident, Stacy spoke to the apartment manager, Kierra G. Kierra had gone to Stacy's apartment when police responded to the incident, and she had seen Talkington "putting something underneath Stacy's head, and he was talking to him." She had seen Stacy and Talkington smoke cigarettes together in the apartment courtyard, and, despite "get[ting] into a little argument from time to time," she thought they were friends.

Kierra testified that the day after the incident, Stacy told her "he lied [the day before] about what happened and that he was terrified and didn't want to go back to his apartment." Stacy told her that "Talkington wasn't there to help. He was the one who actually attacked [Stacy]." Stacy seemed

6

scared, and asked to move apartments because he "didn't feel safe." Stacy asked Kierra not to call the police, but she did anyway.

That day, San Diego Police Detective Matthew Knutson was assigned to the case. He reviewed the responding officers' reports, body-worn camera footage, and photographs. The detective was aware Stacy initially told the responding officers he had a seizure, and that at the hospital he changed his story to "being jumped by someone who he didn't know." The detective went to April's apartment to talk to Stacy "to confirm his new story" about Talkington attacking him. April was present during the interview, which Detective Knutson acknowledged was "not common" police practice.

It was "very hard" for Detective Knutson to get a statement because Stacy "was terrified" and "concerned" about speaking to the police, and was in so much pain.

Detective Knutson testified before Stacy at trial, and related to the jury the version of events Stacy reported to him. Stacy said he had become acquainted with Talkington a few months earlier at Saint Vincent, but stopped associating with him after Talkington started making weird statements. At the time of the incident, they were not friends and did not speak.

On the day of the incident, Stacy heard "banging" on the door, and invited the person in. Talkington flung the door open and flew into the room holding a pocketknife. The knife was silver, had holes and a serrated blade, and was about eight to 10 inches long when opened.

Stacy told Detective Knutson that Talkington jammed the knife into his eyebrow above his left eye, told him he was going to cut his eye out and kill him, and then stabbed him in the eye. Talkington also punched Stacy about 15 times, hitting him so hard his back broke. Stacy reported that Talkington

7

instructed him to tell the police "that it was a seizure," or "he was going to cut his head off." Stacy told the detective "he absolutely believed" this threat, and further believed "that, had the police not knocked on the door when they did, he would have been dead." Stacy said this was why he initially lied to the police and told them he had had a seizure.

Based on his investigation, Detective Knutson instructed uniformed police officers to arrest Talkington. One of the arresting officers photographed Talkington's body and observed no injuries. The photos were shown to the jury. Searches of Stacy's and Talkington's phones found no apparent communications between them. Based on a statement Talkington made while in a holding cell (the substance of which was not communicated to the jury), Detective Knutson searched Stacy's apartment and found a knife behind a microwave in the kitchenette. The knife matched the description Stacy had given, except that the blade was not serrated. There were blood spots on the handle and blade.

Detective Knutson submitted the knife for DNA testing to try to "determine whose DNA was where on the knife" to help "determine who was holding it." DNA analysis showed very strong support that there was a two-person mixture of DNA contributed by Stacy and Talkington. Samples from the blood spot on the blade, the handle (avoiding visible blood), and the blade (avoiding visible blood) revealed mixtures of 65/35, 84/16, and 98/2, with Stacy being the major contributor in each.

Stacy testified at trial after Officer Kain, April, Chantal, and Detective Knutson. Stacy was "terrified" of Talkington while testifying, and admitted to drinking a single 12-ounce can of beer at 2:00 a.m. the day of his testimony because he could not sleep. Stacy described the incident, and the days leading up to it, in substantially similar fashion as the other prosecution

8

witnesses.  He added that when Talkington entered the apartment, Talkington "said something about a CD or a DVD" and began strangling Stacy with the blanket he was wrapped in.  Stacy owned thousands of CDs and DVDs, but had no idea what Talkington was talking about.

Stacy testified Talkington taunted him, threatened to cut off his nose, and actually cut his nose.  Stacy said Talkington used one hand to strangle him with the blanket, and the other to alternate between punching him and sticking him with the knife.  As Stacy lifted his leg to free himself from the "stranglehold," Talkington stabbed him in the back of the leg.  Stacy said he was "begging for [his] life" and "sounded like a girl whimpering."  Stacy said the ordeal lasted 15 to 30 minutes.

Stacy testified he initially lied to the police at the apartment because he believed Talkington's threat that he would cut off Stacy's head if he did not lie.  He lied again at the hospital, saying he "got jumped by three or four people," because he knew Talkington was not yet in police custody.

Stacy testified Talkington had one knife during the assault; Stacy did not own it and had never seen it before; and the only part of the knife Stacy touched was the blade when Talkington was stabbing him with it.

### Defense Case

Talkington did not present an affirmative defense case.  Instead, he focused on Stacy's credibility and conflicting explanations of what happened, and his argumentative, profane, and bizarre demeanor while testifying.

Talkington also argued April and Chantal were "extremely biased" because they were friends with Stacy, while the apartment manager (who contradicted their testimony about Stacy and Talkington being friends) "ha[d] no dog in this show."

9

The defense also emphasized that Stacy had drunk a beer the morning he testified, and that the doctor who diagnosed Stacy with broken vertebrae testified that a person experiencing alcohol withdrawal might have mental confusion and mood changes.

***Verdicts and Sentencing***

The jury found Talkington guilty of assault with a deadly weapon (§ 245, subd. (a)(1)), making a criminal threat (§ 422), and attempting to dissuade a witness from reporting a crime (§ 136.1, subd. (b)(1)); and not guilty of attempted murder (§§ 664, 287, subd. (a)) and burglary of an inhabited dwelling (§§ 459, 460, subd. (a), 667.5, subd. (c)(21)). As to the assault and criminal threat convictions, the jury found true that Talkington personally used a deadly weapon (§ 12022, subd. (b)(1)) and personally inflicted great bodily injury (§ 12022.7, subd. (a)).

The trial court sentenced Talkington to six years in prison.

## DISCUSSION

### I. No Prejudicial Evidentiary Error

Talkington contends the trial court erred by allowing Officer Kain, April, Detective Knutson, and Kierra to testify about hearsay statements Stacy made about what happened.[2] The Attorney General maintains the testimony was admissible as hearsay or nonhearsay evidence of Stacy's fearful state of mind, which was relevant to both the criminal threat count and to explain Stacy's conduct in initially lying about what happened. For reasons we will explain, we find no prejudicial error.

---

[2] The Attorney General contends Talkington forfeited these challenges because, although he objected generally on hearsay grounds when each topic was initially raised, he did not object again to the specific testimony he challenges on appeal. We decline to find a forfeiture because the trial court's repeated rulings made it clear that further objection would have been futile.

## A. Legal Principles

"Hearsay is an out-of-court statement offered to prove the truth of its content." (*People v. Valencia* (2021) 11 Cal.5th 818, 831; see Evid. Code,[3] § 1200, subd. (a).) "Hearsay is generally inadmissible unless it falls under an exception." (*People v. Sanchez* (2016) 63 Cal.4th 665, 674 (*Sanchez*); § 1200, subd. (b).) " 'The proponent of hearsay has to alert the court to the exception relied upon and has the burden of laying the proper foundation.' " (*People v. Turner* (2020) 10 Cal.5th 786, 822.)

"[A] statement 'offered for some purpose other than to prove the fact stated therein is not hearsay.' " (*Sanchez*, *supra*, 63 Cal.4th at p. 674; see *People v. Superior Court* (*Couthren*) (2019) 41 Cal.App.5th 1001, 1019 ["A statement not offered for its truth is, definitionally, not hearsay."].) Evidence offered for a nonhearsay purpose is still subject to exclusion on other grounds, such as relevance or undue prejudice. (See *People v. Ortiz* (1995) 38 Cal.App.4th 377, 389 (*Ortiz*); *People v. Kovacich* (2011) 201 Cal.App.4th 863, 889 (*Kovacich*).) When nonhearsay evidence is admitted as such, it is *advisable* to give a limiting instruction to prevent the jury from considering the evidence for its truth. (*Ortiz*, at p. 389; *Kovacich*, at p. 889; *People v. Wang* (2020) 46 Cal.App.5th 1055, 1080, fn. 9; § 355 ["When evidence is admissible . . . for one purpose and is inadmissible . . . for another purpose, the court upon request shall restrict the evidence to its proper scope and instruct the jury accordingly."].) However, *absent a request*, the trial court generally is *not required* to give a limiting instruction. (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1229 (*Hajek*); *People v. Cowan* (2010) 50 Cal.4th 401, 479 (*Cowan*).)

---

3    Undesignated statutory references in Discussion part I are to the Evidence Code.

Testimony about a victim's out-of-court statement reflecting his or her state of mind can be either hearsay or nonhearsay. (*People v. Riccardi* (2012) 54 Cal.4th 758, 823 (*Riccardi*).) "The threshold determination is whether the proffered statement is . . . being offered to prove the truth of its contents." (*Ortiz*, *supra*, 38 Cal.App.4th at p. 389.)

If offered for its truth, section 1250 provides a hearsay exception for a statement reflecting the declarant's *then existing* state of mind or physical condition, provided the declarant's state of mind is relevant to a disputed issue at trial. (*People v. Flores* (2020) 9 Cal.5th 371, 410.) Evidence admitted under this exception is subject to section 1252, which renders otherwise admissible hearsay inadmissible "if the statement was made under circumstances such as to indicate its lack of trustworthiness." Evidence admitted under this exception is admitted for its truth as to the declarant's state of mind. (*People v. Dworak* (2021) 11 Cal.5th 881, 907.)

Statements about past conduct do not fall within this hearsay exception. (See § 1250, subd. (b) ["This section does not make admissible evidence of a statement of memory or belief to prove the fact remembered or believed."]; *Riccardi*, *supra*, 54 Cal.4th at p. 823; *People v. Deeney* (1983) 145 Cal.App.3d 647, 652 [" 'Ed hit me with a rolled up newspaper' " was not "a statement of physical condition" because "a statement of how a mental or physical condition was caused is not a declaration of either a then existing or previously existing state of mind or physical condition. It is a statement of the declarant's memory of an event."]; *People v. Rincon* (2005) 129 Cal.App.4th 738, 751 [state of mind exception applied to detective's testimony about victim's "bare reference to being wounded in the ankle," but not to the detective's testimony about the victim's statement he "had been shot in the ankle 'as a result of a gun battle' " at a specific location, because these details

12

were inadmissible "evidence of the declarant's memory of the condition-causing event"].)

Thus, for example, although a victim's out-of-court statement " 'I am afraid of John,' is hearsay if offered to prove that the declarant fears John," the statement is nevertheless admissible for its truth under section 1250 if the victim's "state of mind is relevant" to an issue in the case. (*Ortiz, supra,* 38 Cal.App.4th at p. 390; see *Riccardi, supra,* 54 Cal.4th at p. 822 [victim's "statements that she was 'terrified' of defendant . . . were hearsay evidence because they were offered to prove the truth of the matters asserted—that she feared defendant"].)

"In contrast, a statement which does not directly declare a mental state, but is merely circumstantial evidence of that state of mind, is not hearsay. It is not received for the truth of the matter stated, but rather whether the statement is true or not, the fact such statement was made is relevant to a determination of the declarant's state of mind." (*Ortiz, supra,* 38 Cal.App.4th at p. 389; see *Riccardi, supra,* 54 Cal.4th at pp. 822-823; *People v. Dalton* (2019) 7 Cal.5th 166, 232.) "[A]n out-of-court statement describing the declarant's fear is not inadmissible simply because it also contains the reason for that fear, i.e., that the defendant had threatened the declarant." (*Kovacich, supra,* 201 Cal.App.4th at p. 887; see *People v. Brooks* (2017) 3 Cal.5th 1, 39 (*Brooks*) [testimony about victim's "statements that defendant had threatened to kill her" was admissible nonhearsay because the statements "were relevant circumstantial evidence that she was afraid of defendant"]; *Riccardi,* at p. 823 [victim's "indirect declarations of her state of mind" that "contained descriptions or assessments of defendant's conduct that engendered [the victim]'s fear or altered her conduct—e.g., '[Defendant] kidnapped me at gunpoint' . . . were not hearsay to the extent they were

13

admitted to prove circumstantially [the victim]'s state of mind or conduct"];
*Ortiz*, at pp. 385, 391 [victim's statements that the defendant "would make panting noises outside the bathroom door" while she bathed, "had intruded on her when she was in the shower," and that he had sexually assaulted her "would have been inadmissible as hearsay," but were admissible as nonhearsay as "relevant circumstantial evidence" of victim's state of mind].)

We review a trial court's evidentiary rulings, including "its determination of issues concerning the hearsay rule," for an abuse of discretion. (*People v. Clark* (2016) 63 Cal.4th 522, 590.)

We will examine the challenged testimony in the order the witnesses testified at trial.

## B. Officer Kain

Talkington contends the trial court erred by allowing Officer Kain to testify that Stacy told him at the hospital, "I can't talk to you about what happened. They will kill me." The Attorney General maintains there was no error because the testimony was admitted for the nonhearsay purpose of circumstantially establishing Stacy's state of mind, and in any event, because the defense "opened the door" to this testimony during cross-examination. We agree with the Attorney General.

### 1. Background

On direct examination, the prosecutor questioned Officer Kain generally about his observations upon arriving at the crime scene. The officer described the alarming amount of blood, which caused him to immediately doubt Stacy's and Talkington's initial claims that Stacy had merely suffered a seizure. The prosecutor did not ask Officer Kain to relate any statements by Stacy that implicated Talkington or cast doubt on the seizure claim.

14

On cross-examination, defense counsel asked Officer Kain specifically about the content of his interview of Stacy at the hospital. Counsel asked, "Would it be fair to say that [Stacy] did not tell you that there had been this big fight between him and [Talkington] an hour or two before?" The officer responded, "He did not say that."

On redirect, the prosecutor asked Officer Kain whether he had asked Stacy "specifically if [Talkington] did this to him." When the officer responded that he had, the prosecutor asked how Stacy responded. Defense counsel objected on hearsay grounds, which the trial court overruled. Officer Kain testified Stacy responded with "something along the lines of 'You know I can't tell you that.'"

On recross, defense counsel asked Officer Kain, "Would it be fair to say that during the conversation you heard between the medical personnel and [Stacy], [Stacy] still did not say that [Talkington] came in, assaulted him, and attacked him with a knife?" Officer Kain responded that Stacy "did not say those specific words, no."

Finally, on further redirect, the prosecutor asked, "Did you hear [Stacy] say why he couldn't explain what happened?" Officer Kain responded that Stacy said, " 'I can't talk to you about what happened. They will kill me.' " Talkington contends this statement constitutes erroneously admitted hearsay.

## 2. Analysis

The trial court did not err in admitting Officer Kain's challenged testimony because it was nonhearsay that circumstantially proved Stacy's fearful state of mind. The statement was not offered for its truth—that is, that someone would, in fact, kill Stacy if he talked about what happened—rather, it was offered to prove circumstantially that Stacy *believed* someone

15

would kill him if he talked about what happened. This is classic nonhearsay. (See *Brooks*, *supra*, 3 Cal.5th at p. 39 [testimony about victim's "statements that defendant had threatened to kill her" were admissible nonhearsay]; *Ortiz*, *supra*, 38 Cal.App.4th at p. 390 [a statement "offered merely to prove the victim believed [the defendant] to be dangerous . . . is not offered for its truth (thus not hearsay) but merely as circumstantial evidence of the declarant's mental state"].) And it was relevant both to establish an element of the criminal threat count,[4] and to explain Stacy's conduct in not initially disclosing that Talkington had attacked him. Although it would have been advisable to give a limiting instruction, the trial court was not required to do so because Talkington did not request one. (See *Hajek*, *supra*, 58 Cal.4th at p. 1229; *Cowan*, *supra*, 50 Cal.4th at p. 479.)

Even if Officer Kain's testimony would otherwise have been inadmissible hearsay, the defense rendered it admissible by opening the door to it on cross-examination and recross. "Under the doctrine of 'opening the door,' one party may render otherwise inadmissible evidence admissible by introducing the topic selectively such as to leave a misleading impression." (*People v. Kerley* (2018) 23 Cal.App.5th 513, 553; see *People v. Harris* (2005) 37 Cal.4th 310, 335 ["the jury is entitled to know the context in which the [selectively presented] statements . . . were made"]; *People v. Sanders* (1995) 11 Cal.4th 475, 520 [where defense counsel elicited portions of an investigative interview with a witness, the prosecutor was permitted to inquire into the context of the statements on redirect examination of the witness and cross-examination of the investigator]; *People v. Zapien* (1993)

_____

4    The criminal threat offense requires proof that the victim was in "sustained fear" (*People v. Toledo* (2001) 26 Cal.4th 221, 227-228), which "refers to a state of mind" (*People v. Fierro* (2010) 180 Cal.App.4th 1342, 1349).

4 Cal.4th 929, 959.)  Defense counsel's questioning of Officer Kain about only a portion of his interview of Stacy at the hospital would have left the jury with the misleading impression that Stacy said nothing to explain why he gave varying accounts of what had happened.  Thus, to provide the jury a fuller context regarding the reasons for Stacy's conduct, the prosecutor was entitled to ask Officer Kain about other statements Stacy made during that same interview.

## C.  April

Talkington contends the trial court erred by admitting April's testimony for the truth of the matter that Stacy "was screaming" during nightmares "that he's going to come back and get me."  We conclude the testimony was properly admitted as nonhearsay circumstantial evidence of Stacy's fearful state of mind.

The challenged testimony was not hearsay because it was not offered to prove that anyone was, in fact, "going to come back and get [Stacy]."  Rather, it was offered to prove that Stacy *believed* at some level that someone would do so, which reflected Stacy's fearful state of mind.  (*Brooks*, *supra*, 3 Cal.5th at p. 39; *Ortiz*, *supra*, 38 Cal.App.4th at p. 390.)  As noted, Stacy's mental state was relevant both to establish an element of the criminal threat count, and to explain Stacy's conduct in not initially disclosing that Talkington had attacked him.  Thus, the challenged testimony was admissible nonhearsay.  And although it would have been advisable to give a limiting instruction to that effect, the trial court was not required to do so because Talkington did not request one.  (See *Hajek*, *supra*, 58 Cal.4th at p. 1229; *Cowan*, *supra*, 50 Cal.4th at p. 479.)

April's testimony about Stacy's sleep talk may have been objectionable on other grounds, such as relevance (§§ 210, 350) or undue prejudice (§ 352).

But Talkington did not object on any such ground below, as required to preserve the challenge for appeal. (§ 353; see *People v. Dykes* (2009) 46 Cal.4th 731, 756 ["trial counsel's failure to object to claimed evidentiary error on the same ground asserted on appeal results in a forfeiture of the issue on appeal"].)

### D. Detective Knutson

Before Stacy testified, Detective Knutson testified at length (about five pages in the reporter's transcript) about the entire substance of his interview of Stacy the day after the incident. The trial court appears to have admitted this testimony for its truth under a hearsay exception for prior consistent statements. (§§ 1236, 791.) Talkington contends this exception does not apply, and that Detective Knutson's testimony was otherwise inadmissible hearsay. The Attorney General implicitly concedes the prior consistent statements exception does not apply, but maintains "the statements describing Stacy's fear and pain were admissible under the hearsay exception to prove Stacy's state of mind (§ 1250), and the statements describing [Talkington]'s attacks and threats were admissible as nonhearsay circumstantial evidence of Stacy's state of mind."

We accept the Attorney General's concession. The trial court erred by admitting Stacy's out-of-court statements for their truth through Detective Knutson under the prior consistent statement exception. By statute, the exception applies only when a prior consistent statement "is offered *after*" the credibility of a witness's "testimony *at the hearing*" has been challenged. (§ 791, italics added.) Because Stacy had not yet "testi[fied] at the hearing" (*ibid*.), his prior statements were not admissible under this exception.

Nevertheless, we agree with the Attorney General that Detective Knutson's testimony was admissible on other grounds. (See *Brooks*, *supra*, 3

18

Cal.5th at p. 39 [" ' "[W]e review the ruling, not the court's reasoning and, if the ruling was correct on any ground, we affirm." ' "].)  One statement (that Stacy "was terrified") was admissible for its truth as evidence of Stacy's then existing state of mind.  (§ 1250.)  And the balance of the statements about the attack and threats were admissible as nonhearsay circumstantial evidence of Stacy's fearful mental state or to explain his conduct.

Because so much of the circumstantial evidence consisted of Stacy's recounting of past events, which was not admissible for its truth, it "present[ed] an elevated danger of prejudice if the jury [was] unable to distinguish between the truth of the matters asserted and the inferences concerning [Stacy]'s state of mind."  (*Riccardi*, *supra*, 54 Cal.4th at p. 823.)  This danger was further elevated by the lack of a limiting instruction.  But based on our thorough review of the record as a whole, we conclude the admission of the challenged testimony did not prejudice Talkington.

### 1.  Background

After Kierra called the police, Detective Knutson interviewed Stacy "to confirm his new story."  When the prosecutor asked Detective Knutson, "What did [Stacy] tell you—what did he say happened?", defense counsel objected on hearsay grounds, which the trial court overruled.

Detective Knutson then testified in detail about Stacy's statements.  It began with Stacy's detox protocol, which explained why he left his door unlocked.  The detective then described Talkington's entry into the apartment and assault on Stacy.  Next, the detective recounted Stacy's statements about Talkington's threat that he would cut Stacy's head off if he did not tell the police he had had a seizure.  After relating these details, the detective testified about Stacy's description of how he and Talkington met and how they had become estranged.  The detective then returned to Stacy's

19

comments about Talkington's threat, which Stacy said he believed, and that he further believed he would have been dead if the police had not arrived when they did. Stacy told the detective he initially lied about what happened because Talkington threatened to kill him if he did not lie.

At the first recess after this testimony, defense counsel renewed his hearsay objection in detail, stating, "I have to adamantly object about Detective Knutson being able to go through the whole story of what [Stacy] told him. I can understand if [Stacy] testified—" The court interjected, "Look, [Stacy]'s coming in. We'll see what [he] has to say. You know, if he doesn't come in, it all gets struck. All right. But the victim's coming in. [He] has a right to say it, and you can cross-examine. I'm sure it will be fine."

As noted, Stacy ultimately testified at trial consistently with Detective Knutson's recounting.

### 2. Analysis

Talkington appears to concede that one of Stacy's statements to Detective Knutson falls within the hearsay exception for then existing state of mind: that "he was terrified" because "Talkington was right there, and he'd been told if he spoke to police that [Talkington] was going to kill him." We agree that Stacy's statement that "he was terrified" falls within the exception, and was therefore admissible for its truth. (See *Ortiz, supra,* 38 Cal.App.4th at p. 390 [exception applies to "[t]he statement: 'I am afraid of John'"]; *Riccardi, supra,* 54 Cal.4th at p. 822 [exception applies to victim's "statements that she was 'terrified' of defendant"].) The remainder of this portion of the statement was admissible as circumstantial evidence of Stacy's fearful mind, but not for its truth.

The remainder of Stacy's statements to Detective Knutson describing Talkington's assault and threat were admissible as nonhearsay

20

circumstantial evidence of Stacy's fearful state of mind, which was relevant to both an element of the criminal threat count and to explain Stacy's conduct. (See *Brooks*, *supra*, 3 Cal.5th at p. 39; *Riccardi*, *supra*, 54 Cal.4th at p. 823; *Kovacich*, *supra*, 201 Cal.App.4th at p. 887; *Ortiz*, *supra*, 38 Cal.App.4th at p. 385.) As nonhearsay, Stacy's narrative was not admitted for its truth, and should have been accompanied by a limiting instruction to that effect.[5] (*Riccardi*, at p. 823.) And although the wholesale introduction of nonhearsay testimony narrating past conduct "present[ed] an elevated danger of prejudice" (*Riccardi*, at p. 823), we are satisfied on our review of the evidentiary record as a whole that no prejudice occurred. We explain why in part I.F., *post*.

### E. Kierra

Talkington contends the trial court erred by allowing the apartment manager, Kierra, to testify that Stacy told her the day after the attack that he was afraid and wanted to change apartments because Talkington "was the one who actually attacked [him]." Talkington acknowledges in his appellate briefing that "some of the statements may have been relevant as circumstantial evidence [Stacy] was afraid of [Talkington]," but he maintains the court nonetheless erred by failing to give a limiting instruction. We agree the testimony was admissible as nonhearsay circumstantial evidence of Stacy's fearful state of mind. And we conclude Talkington's admitted failure to request a limiting instruction forfeited the issue for appeal. (See *Hajek*, *supra*, 58 Cal.4th at p. 1229; *Cowan*, *supra*, 50 Cal.4th at p. 479.) We are not persuaded by Talkington's suggestion that it would have been futile to

---

5    Talkington's failure to request such an instruction was excusable in light of the trial court's apparent admission of the testimony for its truth under the prior consistent statement exception.

request a limiting instruction in light of the trial court's prior ruling admitting Detective Knutson's testimony for its truth under the prior consistent statement hearsay exception. The trial court's prior rationale related to different testimony from a different witness about different statements.

## F. No Prejudice

Even assuming it was error to admit Detective Knutson's narrative testimony containing nonhearsay circumstantial evidence of Stacy's fearful state of mind, we conclude the error did not prejudice Talkington.

First, Detective Knutson's testimony was rendered cumulative by Stacy's subsequent testimony recounting substantially the same narrative, as well as by the properly admitted nonhearsay testimony by Officer Kain, April, and Kierra establishing Stacy's fearful state of mind. The erroneous admission of evidence ordinarily is not prejudicial when it is cumulative of other properly admitted evidence. (See *Riccardi*, *supra*, 54 Cal.4th at p. 829 [no prejudice where erroneously admitted hearsay "was cumulative to [other] properly admitted evidence"]; *People v. Blacksher* (2011) 52 Cal.4th 769, 818, fn. 29 [assuming admission of hearsay statements was erroneous, their "admission could not have been prejudicial by any standard because they were identical to [other statements properly admitted], and were therefore cumulative"]; *People v. Arias* (1996) 13 Cal.4th 92, 153 [erroneous admission of declarant's prior out-of-court statements "was harmless" where "it was merely cumulative" of other witness's testimony].)

We are unpersuaded by Talkington's assertion that Stacy's "bizarre," "evasive," "threatening," "rude," and "profane" demeanor while testifying rendered him "unquestionably" noncredible. The prosecutor and defense counsel both addressed Stacy's testifying demeanor during their closing

22

arguments, and the trial court properly instructed the jury on relevant factors to consider in determining witness credibility. (See CALCRIM No. 226 [stating in part, "You alone must judge the credibility or believability of the witnesses," and enumerating factors to consider in doing so].) The fact the jury did not convict Talkington on all counts suggests the jury did not accept Stacy's testimony uncritically.

Second, there was other abundant evidence of Talkington's guilt. A disinterested neighbor testified he heard a fight inside Stacy's apartment. This included a death threat by someone claiming to be a former Navy SEAL, which April had heard Talkington claim to be on another occasion. When Officer Kain arrived at the scene, Talkington unlocked the deadbolt on Stacy's door, corroborating Stacy's testimony that Talkington locked the door when he entered the apartment. Officer Kain testified that the alarming amount of blood at the scene (visible in trial exhibits in the appellate record) immediately "made [him] concerned that this might not be just a seizure." Kierra testified she saw Talkington lean over Stacy in the hallway and say something to him. There was very strong support to conclude that Talkington's DNA and Stacy's blood were on a knife hidden behind the microwave in Stacy's kitchen, which Detective Knutson found only in response to an unspecified statement Talkington made during a custodial interview. And defense counsel acknowledged in closing argument that Talkington had lied to the police at the crime scene.

In light of this compelling evidence of Talkington's guilt, we find unpersuasive his contention that the jury hearing Stacy's story from Detective Knutson before hearing it from Stacy improperly "pre-bolstered" Stacy's credibility. Nor do we find it reasonably probable the jury would

23

otherwise have reached more favorable verdicts for Talkington. Thus, any evidentiary error was not prejudicial.

## II. No Prosecutorial Error

Talkington contends the following passage from the prosecutor's rebuttal closing argument "amounted to an indirect comment on [Talkington]'s failure to testify and a shifting of the burden of proof onto" the defense:

> "The third thing that I want you to focus on is the victim's injuries. Defense counsel got up and did not give you one other reasonable explanation for how Stacy . . . got a stab wound on his leg, two separate fractured vertebrae, a black eye, a cut above his eye, a cut on his nose. These, again, are physical, tangible pieces of evidence that cannot be explained other than what Stacy . . . told you."

We conclude Talkington forfeited this challenge by failing to assert it during trial. And even if it were not forfeited, the challenge lacks merit because the prosecutor's comments were fair comment on the state of the evidence.

## A. Background

The prosecutor reminded the jury at the outset of her closing argument that she bore the burden of proving her case beyond a reasonable doubt. She acknowledged Stacy's demeanor at trial was unconventional, but she urged the jury to consider not only his testimony, "but also how all the . . . physical evidence, other witnesses' testimony, [and] circumstantial evidence . . . corroborates and supports" his testimony.

Defense counsel began his closing argument by observing that Stacy and Talkington are the "only two people on the face of this earth who know what really happened in that small apartment." Counsel acknowledged Talkington had lied to the police. But counsel also repeatedly attacked

24

Stacy's credibility, and repeatedly reminded the jury that Talkington had elected to exercise his constitutional right to not testify and to instead rely on the state of the evidence and the prosecution's failure to meet its burden. Defense counsel specifically cited CALCRIM No. 355 ("Defendant's Right Not to Testify") as "the law as [the trial court] has given it to you."[6]

Defense counsel also minimized Stacy's injuries, observing that none were in the area of vital organs; he was "not going to bleed to death from" the cut on his calf that required only a few stitches; and "a reasonable interpretation" for the cut over Stacy's eye was that it "was actually a punch that split his eyebrow open," rather than a knife wound.

Defense counsel concluded by reminding the jury that "the burden of proof is not with the defense," who "chose to not call any witnesses and to rely on the state of the evidence."

The prosecutor made five points during her rebuttal argument. First, she focused on "the physical evidence." Second, she asked the jury to "focus on" the fact Talkington "lied at the scene . . . because he knew that he was guilty." The third point was the passage Talkington challenges here:

> "The third thing that I want you to focus on is the victim's injuries. Defense counsel got up and did not give you one other reasonable explanation for how Stacy . . . got a stab wound on his leg, two separate fractured vertebrae, a black eye, a cut above his eye, a cut on his nose. These, again, are physical, tangible pieces of evidence that cannot be explained other than what Stacy . . . told you."

---

6    CALCRIM No. 355 states: "A defendant has an absolute constitutional right not to testify. He or she may rely on the state of the evidence and argue that the People have failed to prove the charges beyond a reasonable doubt. Do not consider, for any reason at all, the fact that the defendant did not testify. Do not discuss that fact during your deliberations or let it influence your decision in any way."

Defense counsel did not object to this argument.

The prosecutor's fourth point was "the length of the time of the attack." And her final point was that the 911 call was made by a person who "has no dog in this fight."

The prosecutor twice more acknowledged during her rebuttal argument that she bore the burden of proving her case beyond a reasonable doubt.

## B. Legal Principles

In *Griffin v. California* (1965) 380 U.S. 609 (*Griffin*), the United States Supreme Court held the Fifth Amendment prohibits a prosecutor from commenting, directly or indirectly, on a defendant's failure to testify. (See *People v. Bradford* (1997) 15 Cal.4th 1229, 1339 (*Bradford*); *People v. Lewis* (2001) 25 Cal.4th 610, 670.) This includes "argu[ing] to the jury that certain testimony or evidence is uncontradicted, if such contradiction or denial could be provided *only* by the defendant, who therefore would be required to take the witness stand." (*Bradford*, at p. 1339.) But this rule does not "bar prosecution comments based upon the state of the evidence or upon the failure of the defense to introduce material evidence or to call anticipated witnesses." (*Ibid*.) The relevant inquiry is whether it is "reasonabl[y] likel[y] that the jury would have understood [the challenged] remarks as a comment upon [the] defendant's failure to testify." (*People v. Ledesma* (2006) 39 Cal.4th 641, 727.) We independently review claims of *Griffin* error. (*People v. Clair* (1992) 2 Cal.4th 629, 663.)

A defendant forfeits the ability to appeal a claim of *Griffin* error unless the defendant timely objected on that ground at trial and requested that the court admonish the jury to disregard the improper argument. (See *People v. Valdez* (2004) 32 Cal.4th 73, 127 (*Valdez*); *People v. Mesa* (2006) 144 Cal.App.4th 1000, 1006-1007 (*Mesa*).) "The only exception is for cases in

which a timely objection would have been futile or ineffective to cure the harm." (*Mesa*, at p. 1007.)

## C. Analysis

### 1. Forfeiture

We conclude Talkington forfeited his claim of prosecutorial error by failing to object and request a curative admonition during the prosecutor's closing argument. (See *Valdez*, *supra*, 32 Cal.4th at p. 127; *Mesa*, *supra*, 144 Cal.App.4th at p. 1007.) Nothing in the appellate record indicates a timely objection and admonition would have been futile or ineffective.

To avoid forfeiture, Talkington claims his trial counsel was ineffective for failing to object. We are not persuaded. To establish ineffective assistance, a defendant has the burden to show his or her counsel's performance was deficient, and that he or she suffered prejudice as a result. (See *Strickland v. Washington* (1984) 466 U.S. 668, 687; *People v. Mickel* (2016) 2 Cal.5th 181, 198.) "On a direct appeal a conviction will be reversed for ineffective assistance of counsel only when the record demonstrates there could have been no rational tactical purpose for counsel's challenged act or omission." (*Mesa*, *supra*, 144 Cal.App.4th at p. 1007; see *People v. Hoyt* (2020) 8 Cal.5th 892, 958.) "[D]eciding whether to object is inherently tactical, and the failure to object will rarely establish ineffective assistance." (*People v. Hillhouse* (2002) 27 Cal.4th 469, 502.)

Talkington has not met his burden to establish his counsel's failure to object was the result of anything other than a tactical decision. That is, his trial counsel "may well have been concerned that an objection for *Griffin* error, even if sustained with an appropriate admonition, would have simply shifted the focus" to defense counsel's failure to explain-away Stacy's physical injuries and other corroborating prosecution evidence. (*Mesa*, *supra*, 144

27

Cal.App.4th at p. 1010, fn. 4; see *People v. Chatman* (2006) 38 Cal.4th 344, 387 (*Chatman*) ["defense counsel might reasonably have chosen not to object" to statements in prosecutor's rebuttal argument that "were intended to neutralize the defense argument"].)

Because Talkington has not shown that his counsel's failure to object constituted ineffective assistance, that failure forfeited his prosecutorial error claim.

## 2. No Error

Even if Talkington had not forfeited this challenge, it would fail on the merits because the jury was not reasonably likely to construe the prosecutor's challenged statements as referring to Talkington's failure to testify or shifting the burden to the defense.

Most importantly, the prosecutor did not comment on *Talkington*'s failure to testify—she commented on "[*d*]*efense counsel*[*'s*]" failure to "give [the jury] one other reasonable explanation for" how Stacy sustained his extensive injuries. This was a permissible comment on the state of the prosecution's evidence, which did not improperly shift the burden to the defense. (See *Bradford*, *supra*, 15 Cal.4th at p. 1339.)

Talkington maintains that because he and Stacy are the only two people who really know what happened, the prosecution evidence could only be explained away by *his* testimony, thus rendering the argument improper. We disagree. For example, defense counsel attempted to explain-away the evidence by arguing the laceration over Stacy's eye was not a laceration at all, but "was actually a punch that split his eyebrow open." The prosecutor's challenged statement in rebuttal was fair comment on the reasonableness of defense counsel's proffered explanation. (See *Chatman*, *supra*, 38 Cal.4th at p. 386 ["Defendant's challenges to rebuttal must be evaluated in light of the

28

defense argument to which it replied."]; *People v. Centeno* (2014) 60 Cal.4th 659, 672 ["It is permissible [for a prosecutor] to argue that the jury may reject . . . unreasonable interpretations of the evidence and to so characterize a defense theory."].)

Talkington's heavy reliance on *People v. Medina* (1974) 41 Cal.App.3d 438 (*Medina*) is misplaced. The prosecutor in *Medina* argued in closing that, of the "five percipient witnesses to what occurred at the scene of the murders," only three had testified and, thus, "their testimony is *unrefuted*." (*Id.* at p. 457, italics added.) Because the only two other percipient witnesses who could have refuted the testimony were the defendants, the *Medina* court found the prosecutor's comment violated *Griffin*. (*Medina*, at pp. 459-460.)

But in reaching its conclusion, the *Medina* court distinguished words and phrases like "unrefuted" and "no denial"—which " 'connote[ ] a personal response by the accused himself' "—from the word "explain," which " '[a]ny witness could' " do. (*Medina*, *supra*, 41 Cal.App.3d at p. 459.) This is consistent with the broader "distinction . . . between the permissible comment that a defendant has not produced any evidence, and on the other hand an improper statement that a defendant has a duty or burden to produce evidence, or a duty or burden to prove his or her innocence." (*Bradford*, *supra*, 15 Cal.4th at p. 1340; *People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 387 ["a prosecutor is permitted to comment on the state of the evidence and the defendant's failure to call a logical witness, despite the mere possibility that the statement might also be interpreted as a reference to the defendant's failure to testify"].) In light of this distinction, and counsel's and the court's repeated admonitions that Talkington had no affirmative duty to testify or produce evidence, it is not reasonably likely that the jury construed

29

the prosecutor's fair comment on the state of the evidence as implying Talkington had such duties.

### III. Remand for Resentencing

Talkington requests a remand for resentencing because the record does not show that the trial court considered his potential military service-related TBI or PTSD in exercising its sentencing discretion, as required by sections 1170.9 and 1170.91. (See *Panozo, supra*, 59 Cal.App.5th at p. 828.) The Attorney General agrees remand is warranted in light of the ambiguous record on these points. We agree.

### A. Background

The probation officer's report states that when Talkington was arrested, he "told officers he was a Navy Seal and he has 'TBI with a brain injury' and his 'PTSD went off' " during the incident. Talkington told the probation officer he was diagnosed with a brain injury stemming from his service in the Navy, and that sometime after 2002 he was diagnosed with PTSD.

The probation officer advised that Talkington was presumptively ineligible for probation. And although the officer cited several factors favoring a grant of probation, none related to Talkington's reported service-related injuries. Regarding selection of a prison term, the probation officer cited as a mitigating circumstance the fact that Talkington "was reportedly suffering from a mental condition that significantly reduced his culpability for the crime." But the probation officer cited numerous factors in aggravation, and ultimately recommended that the court impose the upper term.

The prosecutor's sentencing memorandum cited several factors warranting denial of probation and imposition of an upper term sentence. The prosecutor did not cite any mitigating factors.

Talkington acknowledged in his statement in mitigation that he was presumptively ineligible for probation, but argued the presumption had been overcome by numerous factors, including that he "indeed does suffer from psychological issues," as demonstrated by the fact his "U.S. Navy records and Veteran's Administration records show that he has suffered from severe depression for many years." Talkington conceded "it is unknown whether his depression played a direct role in this particular case." As factors in mitigation, Talkington cited (among other things) the fact he "has suffered from major depressive disorder and possibly PTSD for many years," and served five years in the Navy. Talkington did not cite sections 1170.9 or 1170.91 in his statement in mitigation.

A psychologist whose report Talkington submitted with his sentencing materials stated there was no indication in Talkington's records that he had been diagnosed with TBI. The psychologist opined it was less likely that Talkington's depression was "incurred or caused by his military service," and more likely that it resulted from chronic social maladjustment.

At the sentencing hearing, defense counsel reiterated that Talkington has suffered from "a lot of issues over the years." Counsel believed Talkington suffered from PTSD from his military service, though counsel acknowledged Talkington's records were inconclusive on that point. Counsel also believed Talkington suffered from a service-related TBI, after which his "issues really began." Counsel requested that the court place Talkington on probation, or impose a lower term sentence. Counsel did not mention sections 1170.9 or 1170.91 at the hearing.

31

The trial court noted it had reviewed all the materials submitted in connection with sentencing. The court stated it agreed with the jury's verdicts, and found "this is not a probation case." The court based this finding on Talkington's history of violent offenses, prior felonies, and the violent nature of the current offense. Accordingly, the court denied probation.

With regard to the sentence on the aggravated assault conviction, the court "select[ed] the midterm of three years as the proper term," plus "a consecutive three years' sentence" on the great bodily injury enhancement. The court stayed the weapon-use enhancement on the basis "it's part of the crime." The court also imposed midterm sentences on the criminal threat and dissuasion convictions, but stayed them under section 654.

## B. Legal Principles

Under sections 1170.9 and 1170.91, the trial court is obligated "to consider a criminal defendant's qualifying service-related conditions as mitigating circumstances in making discretionary sentencing choices." (*Panozo*, *supra*, 59 Cal.App.5th at p. 831.) Section 1170.9, subdivision (a), provides that "[i]n the case of any person convicted of a criminal offense who could otherwise be sentenced to county jail or state prison and who alleges that the person committed the offense as a result of . . . [TBI] [or] [PTSD] . . . stemming from service in the United States military, the court shall, prior to sentencing, make a determination as to whether the defendant was, or currently is, a member of the United States military and whether the defendant may be suffering from . . . [TBI] [or] [PTSD] . . . as a result of the person's service." Under subdivision (b)(1) of this statute, "If the court concludes that a defendant convicted of a criminal offense is a person described in subdivision (a), and if the defendant is otherwise eligible for

32

probation, the court shall consider the circumstances described in subdivision (a) as a factor in favor of granting probation."

Where the court has decided to deny probation, section 1170.91, subdivision (a) requires further, "[i]f the court concludes that a defendant convicted of a felony offense is, or was, a member of the United States military who may be suffering from . . . [TBI] [or] [PTSD] . . . as a result of his or her military service, the court shall consider the circumstance as a factor in mitigation when imposing a term under subdivision (b) of Section 1170."

In *Panozo*, this court concluded that sections 1170.9 and 1170.91 "speak in terms that are mandatory rather than permissive" and thus, that they "unambiguously *obligate*" a sentencing court to consider a defendant's service-related TBI or PTSD in making discretionary sentencing choices. (*Panozo*, *supra*, 59 Cal.App.5th at p. 836.) We noted in *Panozo* that the defendant's "sentencing brief asked for probation, referenced his service-related PTSD, and provided documentation to support his diagnosis and request for treatment. And defense counsel argued extensively at sentencing that his client's crimes were the byproduct of his military service, warranting probation or imposition of the lower term." (*Id*. at pp. 837-838.) We also noted that although the trial court "was plainly aware that [defendant] served in Iraq, struggled with PTSD and alcohol use, and requested probation and treatment through Veterans Court," there is no indication the court understood its obligation to consider that fact as a circumstance in mitigation when making discretionary sentencing choices. (*Id*. at p. 838.) Accordingly, we remanded the matter for resentencing because "a court's compliance with the mandates of sections 1170.9 and 1170.91 cannot be inferred from an ambiguous record." (*Id*. at pp. 836-837.)

## C.  Analysis

As in *Panozo*, the appellate record here shows the trial court undoubtedly was aware that Talkington served in the U.S. Navy and may have sustained a service-related TBI or PTSD.  And also as in *Panozo*, the record is ambiguous as to whether the trial court expressly considered those potential conditions when making discretionary sentencing choices.  Accordingly, we will remand for resentencing.

## DISPOSITION

The matter is remanded for a new sentencing hearing at which the trial court should satisfy its statutory obligations under sections 1170.9 and 1170.91.  In all other respects, the judgment is affirmed.


HALLER, J.

WE CONCUR:


McCONNELL, P. J.


O'ROURKE, J.